**AQUIFER GUARDIANS IN URBAN AREAS, Plaintiff,**

v.

**FEDERAL HIGHWAY ADMINISTRATION; United States Fish and Wildlife Service; Amadeo Saenz, Executive Director, Texas Department of Transportation; Terry Brechtel, Executive Director, Alamo Regional Mobility Authority, Defendants.**

Civil Action No. SA–08–CA–154–FB.

United States District Court,
W.D. Texas,
San Antonio Division.

April 22, 2011.

Charles Anthony Riley, Law Offices of Charles Riley, P.C., Charles Darby Riley, Attorney at Law, San Antonio, TX, William G. Bunch, Andrew Hawkins, Save Our Springs Alliance, Inc., Austin, TX, for Plaintiff.

Clayton R. Diedrichs, U.S. Attorney's Office, Jonathan D. Pauerstein, Tuggey Rosenthal Pauerstein Sandoloski Agather LLP, San Antonio, TX, Jack Foster Gilbert, Federal Highway Administration, Lisa Marie McClain, Office of the Atty. General Transportation Division, C. Brian Cassidy, James W. Checkley, Jr., Locke Lord Bissell & Liddell, Andrew S. Miller, Kemp Smith, LLP, Darcy A. Frownfelter, Kemp Smith, PC, Austin, TX, Lawson Emmett Fite, Kevin W. McArdle, U.S. Department of Justice, Washington, DC, Elizabeth E. Mack, Locke Lord Bissell & Liddell, LLP, Dallas, TX, for Defendants.

*OPINION AND ORDER CONCERNING THE INTERNAL COMBUSTION ENGINE, $H_2O$, HOMO SAPIENS AND RHADINE EXILIS. (AND THE SURVIVAL OF THE LATTER TWO)*

FRED BIERY, Chief Judge.

**Progress might have been all right once, but it has gone on too long.[1]**

---

**1.** Ogden Nash, *Come, Come, Kerouac! My Generation is Beater Than Yours,* The New Yorker, April 4, 1959. at 45.

*PROLOGUE*

With a reverse cliché nod to Mr. Dickens,[2] it was the worst of times and the best of times.

*"The Way We Were"*[3]

*South Texas. 1950–1970*
*The Worst of Times*

Men returned from World War II with medals for heroism, but could not serve on juries if their skin was brown.[4]

A family which would produce two United States Congressmen was not allowed to enjoy a public park because their name was Gonzalez.[5]

The Bellinger family on the segregated East Side of San Antonio paid taxes to support the University of Texas School of Law, but could not attend because their ancestors were brought involuntarily from Africa. Subsequently though, one Bellinger helped to right the wrong.[6]

The Velas and the Prados struggled to educate their children in the underfunded Edgewood Independent School District, notwithstanding the promise of equal education in the Texas Constitution.[7] And Culebra Road seemed as wide as the Mississippi River to kids named Gloria and Ed.[8]

Women who preferred careers to domesticity could be secretaries, teachers or nurses. If they were married and wished to invest in real estate, husbands had to give permission based on the legal requirement of coverture.[9] Nor were they seen

---

**2.** "It was the best of times, it was the worst of times." Charles Dickens, *A Tale of Two Cities* 13 (Signet Classic 1997) (1859).

**3.** "The Way We Were" is the title song to the 1973 movie starring Barbara Streisand and Robert Redford. The song was written by Alan Bergman and Marilyn Bergman and scored by Marvin Hamlisch. ALAN & MARILYN BERGMAN: THE OFFICIAL WEBSITE, http://www.alan&marilynbergman.com (last visited Mar. 10, 2011).

**4.** Gustavo "Gus" C. Garcia worked with fellow San Antonio attorney Carlos Cadena in the landmark case of *Hernandez v. Texas*, 160 Tex.Crim. 72, 251 S.W.2d 531 (Tex.Crim.App. 1952), *rev'd*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). successfully arguing before the United States Supreme Court for the end of the practice of systematically excluding Hispanics from jury service in Texas.

**5.** David Monteiano. *Quixote's Soldiers: A Local History of the Chicano Movement 1966–1981* 91 (University of Texas Press 2010) (including Landa Park as a "historical reference to [Congressman] Gonzalez's much publicized encounter with segregation in New Braunfels [Texas] in the mid 1950s").

**6.** Herman Marion Sweatt volunteered to be the plaintiff in *Sweatt v. Painter*, 210 S.W.2d 442 (Tex.Civ.App.-Austin, 1948, writ ref'd), *rev'd*, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950). the desegregation lawsuit which the NAACP formulated against the University of Texas in the mid–1940s. Prominent African–American attorneys were involved, including Harry Bellinger of San Antonio.

**7.** Discrimination against children in poor school districts continued until the Texas Supreme Court reversed the holding of the Austin Court of Appeals in *Kirby v. Edgewood Independent School District.*, 761 S.W.2d 859 (Tex.App.-Austin, writ granted), *rev'd*, 777 S.W.2d 391 (Tex.1989). Albert H. Kauffman of San Antonio and other prominent lawyers successfully challenged the school financing system which was based in part upon local district financing. *Kirby*, 777 S.W.2d at 392. The Supreme Court found this system, which showed a 700 to 1 ratio between the value of taxable property in the wealthiest and poorest districts, and district spending per student varied from $2,112 to $19,333, violated the Texas constitutional provision requiring an "efficient" and "free" public school education. *Id.*

**8.** United States Circuit Judge Edward Prado and Deputy United States District Clerk Gloria Vela.

**9.** Laws of the Republic of Texas, An Act to Adopt the Common Law of England—To Repeal Certain Mexican Laws, and to Regulate the Marrital [sic] Rights of Parties, Approved

on juries as full partners in a supposedly democratic society.[10]

Girls who wanted to participate in school activities had opportunities in band, choir, pep squad or cheerleading, but not in basketball, volleyball, track or softball until Title IX became federal law.[11]

### The Best of Times South Texas, 1950–1970

Air conditioning was virtually nonexistent.

Human obesity largely occurred in small numbers. "We're Number One," was a chant denoting a winning sports team; now it refers to America's fatness (not fitness) ranking in the world.[12]

Allergies and asthma were rare.

Sleeping outside or on screened-in porches in August was normal.

Young *Homo sapiens*, born after World War II, whom the Court denominates *Infantilus boomeramus*, played outside, returning to those thrilling days of yesteryear with a hearty "Hi–Yo Silver!"[13] and leaped imaginary buildings in a single bound,[14] wearing capes made from old pil-

Dec. 22, 1840, 5th Cong., R.S., §§ 3, 4, 1841 Repub. Tex. Laws 4, *reprinted in* 2 H.P.M. Gammel, *The Laws of Texas 1822–1897*, at 178 (Austin, Gammel Book Co. 1898) (codified at Tex. Civ. Stat. art. 1299 (1925)), repealed by Acts 1963, 58th Leg., p. 1189, ch. 473, § 1, eff. Aug. 23, 1963; *see also Black's Law Dictionary* 422 (9th ed. 2009) ("*Coverture*, is a french word … particularly applied in our common law, to the estate and condition of a married woman, who, by the lawes of our realme, is in (*potestate vire* ) [under the power of her husband] and therefore disabled to contract … without his consent and privity; or at the least without his allowance and confirmation.") (quoting John Cowell, *The Interpreter* (1607)).

10. Prior to the adoption of the Texas Constitution, "the common law of England was adopted during the existence of the Republic, as early as 1840, thus bringing in, as a part of that system, the definition of the term 'jury,' which, when used without qualification, addition or prefix, meant a body of twelve men." *Glover v. Cobb*, 123 S.W.2d 794, 796 (Tex.Civ. App.-Dallas 1938, writ ref'd). "Throughout the constitutional and statutory history of the subject, the people in their legislative capacity, and the Legislature in its representative capacity, without break in continuity, repeatedly announced that men only were eligible for jury service." *Id.; see* TEX. CONST. art. 5, § 13 (requiring grand and petit juries to be composed of twelve men); TEX.CODE CRIM. PROC. art. 349 (providing for completion of grand jury until it shall include twelve men); TEX. CIV. STAT. art. 2133 (providing that all male persons over twenty-one years of age unless disqualified are competent petit ju-

rors); TEX. PENAL CODE art. 19 (defining "man" as used to signify a male person of any age, and the word "woman" a female of any age not eligible for jury service). Women were not permitted to serve on a jury until Article 16, § 19 of the Texas Constitution was amended in November of 1954.

11. 20 U.S.C. § 1681 (prohibiting gender discrimination in physical education and other school programs which receive federal funding).

12. With the exception of tiny Pacific Island nations which prize obesity, the United States tops the list of the world's fattest countries. *See* WHO, *World Health Statistics 2010* (2010).

13. Departing on his white stallion, Silver, the Lone Ranger would shout, "Hi-yo, Silver! Away!" The Lone Ranger is a fictional masked Texas Ranger who, with his Native American companion, Tonto, fights injustice in the American Old West. The character has become an enduring icon of American culture. David H. Shayl, *Hi–Yo, Silver! Away!*, SMITHSONIAN MAGAZINE, October 2001, *available at* http://www.smithsonianmag.com/history-archaeology/Hi-Yo_Silver_Away.html (last visited Mar. 14, 2011).

14. Excerpt from the opening narration of the radio and television *Adventures of Superman* (RKO–Pathe Studios ˙1952–1957) ("Faster than a speeding bullet. More powerful than a locomotive. Able to leap tall buildings in a single bound. Look! Up in the sky! It's a bird. It's a plane. It's Superman!").

lowcases. They rode bikes or walked to schools which had windows that opened! The birth months of South Texas *Infantilus boomeramae,* minus nine, provide anecdotal evidence that the fundamental functioning of the procreation process took place in the cooler months, not in July or August.

Moms cooked and hung clothes on the line to dry. Dads supported the family on one income. Sons and daughters mowed the grass and washed the family car. Coaches had authority to apply wooden paddles to the *gluteus maximus* of misbehaving boys. But, alas, there was no three point shot for vertically-challenged basketball players. On the other hand, elderly people did not run multiple marathons as some do today.[15]

The nascent San Antonio Airport was surrounded by grazing land and cows.[16] Nearby, a youngster named Jim rode horses on property now covered with the asphalt, steel and concrete known as the Nowlin Building and the SWBC Tower. Meanwhile, about fifteen miles south, his future friend and colleague, affectionately known as Hippo, rarely ventured north of Hildebrand because his last name was Garcia. And the Rodriguez family could rent a home in Harlandale only if put in the name of an Anglo wife.[17]

Boerne, Kendall County, Texas had one flashing yellow light and one police officer who was also the Chief (Earl Buck). Kerr County had more goats and sheep than people.

One could drive north on two lane U.S. Highway 281 and see clear Edwards Aquifer water streaming from the limestone, some of which was used to brew La Cerveza Perla from the "Country of 1100 Springs." [18]

There were few traffic or water issues notwithstanding the severe drought of the 1950s.[19]

Lawyers Maverick, Cadena and Kauffman,[20] the Civil Rights Movement, and strong liberated women named Cockrell, Jarboe, Tafolla, and Valdez [21] addressed

---

**15.** The most marathons completed in one year by an American male was 106 by R. Laurence Macon between January 1st and December 31st, 2010. Mr. Macon was 66 years old at the completion of his record setting year. GUINNESS WORLD RECORDS, MOST MARATHONS RUN IN A CALENDAR YEAR, MEN (2011) (http://www/guinnessworldrecords.com/Search/Details/Most-marathons-run-in-a-calendar-year,-Men/59080.htm) (last visited April 4, 2011).

**16.** Statement of Lackland Air Force Base 1964 trainee and United States Air Force (retired) Master Sergeant and Federal Court Security Officer Ralph Miller. Honor Guard to President Gerald Ford and President Jimmy Carter.

**17.** Statement of United States District Court Judicial Assistant Gilbert Rodriguez.

**18.** "From the Country of 1100 Springs" has been the slogan of Pearl beer since 1961. The Pearl Brewing Company was an American brewery established in 1883 in San Antonio. Pearl beer is still in production at Miller Brewing facility in Fort Worth. Texas.

**19.** Texas baked under the most severe drought recorded to date in history from 1950 to 1957. (http:/www.tsl.state.tx.us/exhibits/parks/1950s/page1.html) (list visited March 25, 2011).

**20.** Maury Maverick, Jr. and Carlos Cadena of San Antonio represented the plaintiff in *Harvey v. Morgan,* 272 S.W.2d 621 (Tex.Civ.App.-Austin 1954, writ ref'd n.r.e.), the case which ended segregation in Texas boxing in 1954. As noted in endnote 20, Albert Kauffman represented the plaintiff in *Edgewood School District v. Kirby,* 777 S.W.2d 391 (Tex.1989). the case which ended discrimination against children in poor school districts.

**21.** The Honorable Lila Banks Cockrell was the first female mayor of a major American

the worst of times, though a perfect union has yet to be formed.

The sounds of affordable air conditioning silenced the best of those mystic chords of memory.[22]

*A Funny Thing Happened on the Way to Modernity* [23]

With artificially cooled cocoons, *Homo sapiens* theretofore unable or unwilling to take the heat in Texas began, and continue today, a diaspora from foreign states north, east and west of Texas:

One wag once waxed wittily: "Texans, you are guarding the wrong river." [24]

Instead of far from the madding crowd,[25] Texans saw the crowd getting closer and

city and the only woman who has held the position in the City of San Antonio. At a time in when most "gals" were corralled in what was known as the "Women's section" of the newspaper. Ms. Jan Jarboe Russell landed a job in the newsroom and reported on serious issues as San Antonio females took their place in politics, business, art and every other field. Jan Jarboe Russell. *Goodbye, Readers, its time to Write a Book*, San Antonio Express News, March 27, 2011. Dr. Carmen Tafolla, one of the most anthologized of Latina writers, has published work for both children and adults in more than 200 anthologies, magazines, journals, textbooks and readers. Http://www.carmentafolla.com (last visited April 17, 2011). Sheriff Lupe Valdez. of Dallas County, is Texas's only elected female sheriff. Http://www.lupevaldez.com/about. html (last visited April 18, 2011).

22. From the First Inaugural Address of President Abraham Lincoln, March 4, 1861.

23. A FUNNY THING HAPPENED ON THE WAY TO THE FORUM, (New York run: Alvin Theatre, beginning May 8, 1962). is a musical with music and lyrics by Stephen Sondheim and book by Burt Shevelove and Larry Gelbart. Inspired by farces of the ancient Roman playwright Plautus (251–183 BC), it tells the bawdy story of a slave named Pseudolus and his attempt to win his freedom by helping his young master woo the girl next door. Syanley Green and Kay Green. *Broadway Musicals, Show by Show*, 198 (Hal Leonard Corp.1996).

24. Author unknown.

25. *Far from the Madding Crowd*, (Harper & Brothers edition, 1912) (1874), is Thomas

traffic more maddening. From a 1950 population of 500,000, Bexar County is now over 1,700,000 of suburban sprawl.[26] Comal, Kendall and Kerr, once pristine preserves of natural beauty, have fallen prey to avaricious, rapacious, and sometimes mendacious, development and its ubiquitous impervious cover of asphalt, roofs, concrete, shopping and eating venues. While many species live in the area in question, the subjects of this proceeding are *Homo sapiens* and karst invertebrates known as *Rhadine exilis* and *Rhadine infernalis*.

The conundrum facing this region is how to balance and manage finite resources of water, land, flora and fauna in light of exponential increases in the number of *Homo sapiens* and their vehicles, and the concomitant destruction of nature upon which all species rely for life. Perhaps a mission impossible.[27]

| 1950 Census [28] | | 2010 Census [29] |
|---|---|---|
| 500,460 | Bexar County | 1,714,773 |
| 5,423 | Kendall County | 33,410 |
| 16,357 | Comal County | 108,472 |
| 25,392 | Guadalupe County | 131,533 |
| 14,022 | Kerr County | 49,625 |
| Total: 561,654 | | 2,037,813 |

The best solution would be a reverse migration of one million *Homo sapiens* to north of the Red River and east of the Sabine. The Court unfortunately does not have power to order such movement, but it could occur if air conditioning were unaffordable or the Edwards Aquifer becomes toxic or runs dry. Indeed, the slow cancerous death of drought visits again,[30] but with four times as many humans sucking from the same basic water hole.

The forty days and nights of Noah are looking better.[31]

---

Hardy's fourth novel. It centers on Gabriel Oak, an up and coming, yet frugal, shepherd in the prime of life at twenty-eight, who falls in love with a newcomer eight years his junior. Bathsheba Everdene, a proud and somewhat vain young beauty, who arrives to live with her aunt.

26. Http://www.census.gov/population/cencounts/tx190090.txt; Http://www.census.gov/2010census/data.txt.

27. *Mission: Impossible is an American television and movie series which was created and initially produced by Bruce Geller.* It chronicles the missions of a team of secret American government agents known as the Impossible Missions Force ("IMF"). The television series ran on both CBS and ABC, Mission: Impossible (CBS 1966–1973); (ABC 1988–1990). The first movie based on the television series of the same name was made in 1996. and was followed by two sequels in 2000 and 2006. with a fourth installment due later this year. Mission: IMPOSSIBLE (Paramount Studios 1996, 2000, 2006, 2011).

28. Http://www.census.gov/population/cencounts/tx190090.txt; (last visited March 30, 2011).

29. Http://www.census.gov/2010census/data.txt (last visited March 30, 2011).

30. The great drought of 2011 may have started in October 2010. According to the National Climatic Data Center, the months of October and November were the state's eighth-driest on record and second-driest in 44 years. This trend continued during the months of December and January. and February was the seventeenth driest on record. State of the Climate. National Overview, October 2010–February 2011. found at: Http://ncdc.noaa.gov/sotc/national/ (last visited April 1, 2011). The National Weather Service reports that March was also very dry. with rainfall of less than one half the normal to date, and the outlook is not good for any significant rainfall over the next few months, at least. National Weather Service. Drought Information Statement, found at: Http://www.crh.noaa.gov/product.php?site==NWS (last visited April 1, 2011).

31. The length of time it rained while Noah was on the ark was forty days and forty nights. *Genesis* 7:12.

The lesson of move, adapt or die applies. Dinosaurs did not learn; cockroaches did.

In the meantime, the record reflects massive vehicular traffic congestion sought to be alleviated by proposed ramps connecting U.S. Highway 281 and Loop 1604.[32]

The status quo of idling internal combustion engines on the subject roadways spews large quantities of carbon monoxide for Mother Earth to breathe, not a nice thing to do to one's mother, and causes automobile droppings onto and into the Edwards which the Court calls Petro Poop.

## APOLOGUE

### The Law and Just the Facts, Ma'am [33]

Notwithstanding the foregoing historical observations and personal lamentation, the Court's obligation is to rule of law standards evolved through legislation, regulation, and stare decisis.

Rather than a case to be decided in the first instance in a court of law, this is an appeal from administrative and regulatory bodies to a court of law. As a result, this Court does not decide as a fact finder based on a preponderance of evidence standard, but instead sits in an appellate capacity to review administrative decisions [34] based on a standard of whether such decisions were arbitrary and capricious.[35]

---

**32.** Administrative Record *passim.*

**33.** Dragnet was a radio and television crime drama about the cases of a dedicated Los Angeles police detective. Sergeant Joe Friday, and his partners. Sergeant Joe Friday's famous catchphrase. "Just the facts, ma'am," entered the American subconscious during an episode which aired on television on October 10, 1951. J. Michael Hayde. *My Name's Friday: The Unauthorized but True Story of Dragnet and the Films of Jack Webb,* 73 (Cumberland House 2001).

**34.** *Airport Impact Relief, Inc. v. Wykle,* 192 F.3d 197, 202 (1st Cir.1999) (noting that district court's review of Federal Highway Administration's decision is appellate in nature when reviewing agency action taken under NEPA): *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1538–39 (11th Cir.1990) (pointing out that district court sits as appellate court when reviewing agency action in NEPA case); *see also Trout Unlimited v. United States Dept. of Agric.,* 441 F.3d 1214, 1219 (10th Cir.2006) ("If the Forest Service's decision on remand is not satisfactory, defendant-intervenors can pursue administrative remedies and, if necessary, seek appellate review in the district and appellate courts at a later stage in the proceedings.").

**35.** Federal regulatory agencies, such as the Federal Highway Administration, are "charged with keeping the ball somewhere around the 50–yard line as between encroaching human activity and environmental concerns." *Center for Biological Diversity v. United States Fish & Wildlife Serv.,* 202 F.Supp.2d 594, 597 (W.D.Tex.2002) (Biery, J.). The law requires the judicial branch of government to give deference to administrative agency decisions so long as they are supported by substantial evidence and are not arbitrary and capricious. *See Newell Recycling Co., Inc. v. United States Envtl. Prot. Agency,* 231 F.3d 204, 206 (5th Cir.2000) (decision by Environmental Protection Agency's Appeal Board must be affirmed by court unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Meadows v. Sec. & Exch. Comm'n,* 119 F.3d 1219, 1224 (5th Cir.1997) (finding that court must uphold decision by agency unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; factual findings by the Commission to be upheld "if supported by substantial evidence"); *Louisiana v. Mathews,* 427 F.Supp. 174, 175 (E.D.La.1977) (judicial review of action by Food & Drug Administration banning sale and distribution of small turtles limited to whether defendants acted "arbitrarily, capriciously, in abuse of their discretion or otherwise unlawfully"); *see also Texas Alcoholic Beverage Comm'n v. Top of the Strip, Inc.,* 993 S.W.2d 242, 249 (Tex.App.-San Antonio, 1999, pet. denied) (court's review of TABC order based on substantial evidence rule; court may reverse or remand case if substantial rights of appellant

## Summary of Arguments

Plaintiff seeks a preliminary injunction to maintain the aforesaid traffic congestion status quo until further environmental impact analysis can be accomplished. Plaintiff asserts a much larger expanse of the 281/1604 environs should be included rather than just the area over which the ramps would be built, and the administrative agency decision to exempt the project should be blocked by the Court because it was arbitrary and capricious.

Defendants respond that the administrative process provided appropriate public debate and the Federal Highway Administration decision to grant an exemption from environmental studies was made according to correct legal standards, was not arbitrary and capricious and, therefore, should not be reversed by the Court and that a two to three year environmental study of the larger area north of Loop 1604 is underway.[36]

In lieu of a thousand words, two pictures show:

have been prejudiced because administrative findings, conclusions, inferences, or decisions are "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion"; reviewing court evaluates reasonableness not correctness of the order).

**36.** On July 8, 2009, after the Federal Highway Administration withdrew its approval of the Finding of No Significant Impact, defendants published notice of intent to prepare an EIS "for a proposed transportation project on [U.S. 281] from Loop 1604 to Borgfeld Road, about 7.5 miles in Bexar County, Texas." Notices: Federal Highway Administration—Environmental Impact Statement: Bexar County, Texas, 74 Fed.Reg. 32,684 (July 8, 2009); see also http://www.411on281.com/us281eis/index.cfm/understanding-an-ies/eislocation-map/ (defendant ARMA's website providing EIS location map) (last visited March 30, 2011). The EIS "will develop and evaluate a range of alternatives including 'No action' (the no-build alternative), Transportation System Management (TSM)/Transportation Demand Management (TDM), rapid transit and roadway build alternatives." 74 Fed. Reg. 32684. In Defendants' Joint Response to the Court's Request for Record Designation or Additional Information, (docket no. 154 at 2–3), defendants explain the time line for completion of the EIS is difficult to predict. Several public meetings have been held, but a draft EIS identifying the range of alternatives for analysis, including the preferred alternative, has not yet been issued. Defendants presently estimate that Notice of Availability of the Draft EIS will be published in the Federal Register in or about February 2012. Id. at 2. Defendants will then solicit, analyze, and address public comments on the draft EIS as required by 40 C.F.R. § 1503.1 and 40 C.F.R. § 1503.4. Id. Defendants will conduct a public hearing and conduct at least one additional public meeting prior to preparing the final EIS. Id. Defendants presently estimate that Notice of Availability of the final EIS will be published in the Federal Register in or about June of 2013. Id. It is estimated that the FHWA will issue its Record of Decision regarding the final EIS in October in or about October of 2013. Id. at 3. The Record of Decision constitutes the final agency action concluding the NEPA process. 40 C.F.R. § 1505.2; see also Oregon Natural Desert Ass'n v. Bureau of Land Mgmt., 625 F.3d 1092, 1118 (9th Cir.2010) ("Once an EIS's analysis has been solidified in a [Record of Decision], an agency has taken final agency action.").

# The Problem

# and the Proposed Solution

*See* Alamo Regional Mobile Authority website at http://www.alamorma.org/index.cfm/ projects/us–281–loop–1604–interchange for more detail.

Although it is undisputed that hundreds of thousands of vehicles pass through the U.S. 281/Loop 1604 interchange everyday, there is no direct connection between either roadway. All vehicles traveling between U.S. 281 and Loop 1604 must exit to frontage roads and travel though stop lights. Backups at the lights can be extreme. During the afternoon peak period, there is a queue of approximately 1,000 vehicles per hour waiting to turn from northbound U.S. 281 to westbound and eastbound Loop 1604. Administrative Record ("AR") Doc. 338 at 1. The substantial backups have created unsafe conditions. *Id.* at 2–4. In 2008, 132 collisions were reported at the interchange—more than any other interchange in San Antonio. *Id.* at 4.

Construction has begun on a project developed by the Alamo Regional Mobility Authority ("ARMA"), the Texas Department of Transportation ("TxDOT"), and the Federal Highway Administration ("FHWA") which hopes to provide relief. The project involves constructing ramps between U.S. 281 North and Loop 1604 where congestion is most severe, auxiliary lanes to insure the ramps operate safely and efficiently, and additional safety and mobility enhancements in the project area. Beyond improving safety, the project will eliminate up to 511,000 hours of traffic delays annually, resulting in a cost savings of $7 million. AR Doc. 338 at 1–5; AR Doc. 112 at 10.

Because of the FHWA's involvement and the use of federal funds, an analysis of the projects's potential environmental impact was required under the National Environmental Policy Act ("NEPA").[37] ARMA, TxDOT, and the FHWA collaboratively conducted a detailed analysis, concluding the project will have no significant environmental impact. AR Doc. at 338. On February 24, 2010, after considering the results of the environmental analysis, public input and other studies and information contained in the Administrative Record, the FHWA concluded that the project qualified as a categorical exemption under FHWA regulations and that no further NEPA review was required. AR Doc. at 340.

On August 31, 2010, plaintiff moved to reopen this lawsuit to challenge the interchange project under NEPA and the En-

---

**37.** Congress passed NEPA to focus governmental and public attention on the potential environmental effects of any proposed "major federal action." *See* 42 U.S.C. § 4332; *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 361, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Council on Environmental Quality regulations provides guidance to agencies in applying the Act. 40 C.F.R. §§ 1500–1508; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA's statutory and regulatory mandate is "essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The statute does not mandate a particular result, but instead prescribes that federal agencies simply consider the potential environmental consequences of proposed actions. *Robertson*, 490 U.S. at 350, 109 S.Ct.

1835; *see also O'Reilly v. United States Army Corps of Eng'rs*, 477 F.3d 225, 228 (5th Cir. 2007). The environmental information required by NEPA must be "available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. 1500.1(b). While NEPA does not command agencies to select an environmentally preferable course of action, it does require the agency's decision to be "environmentally conscious." *Sierra Club v. Sigler*, 695 F.2d 957, 976 (5th Cir.1983). Thus, two fundamental principles underlie NEPA's requirements: federal agencies have the responsibility to consider the environmental effects of major actions significantly affecting the environment, and the public has the right to review this consideration. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 101, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

dangered Species Act. On December 20, 2010, after defendants filed the Administrative Record of over 10,000 pages, plaintiff filed the instant motion seeking a preliminary injunction, which would maintain the current traffic congestion status quo.

The legal issue before the Court in this preliminary injunction proceeding is whether the Federal Highway Department's determination that the U.S. 281/Loop 1604 interchange project is entitled to a categorical exemption ("CE")[38] from the NEPA is arbitrary and capricious. Though plaintiff contends that FHWA bears the initial burden of demonstrating its decision was valid, the agency's decision is presumed valid under the Administrative Procedure Act ("APA"). *Visiting*

*Nurse Ass'n, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir.2006). The burden falls entirely on plaintiff to overcome the presumption and demonstrate a likelihood of success on its claim that FHWA's decision does not meet even "minimal standards of rationality," which is all that is required for the decision to survive deferential APA review. *Gulf Restoration Network v. United States Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir.2006). Plaintiff also bears the burden of demonstrating its members are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips decidedly in plaintiff's favor, and an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365,

---

**38.** The National Environmental Policy Act ("NEPA") requires that federal agencies prepare a detailed report, known as an environmental impact statement ("EIS"), for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Pursuant to NEPA, the Council on Environmental Quality has promulgated an array of regulations, some of which govern the procedures a federal agency must follow to determine whether an agency action is one which requires the preparation of an EIS. *See generally* 40 C.F.R. pts. 1500–1508. First, the agency can prepare a shorter document, known as an environmental assessment ("EA"), and, based on the EA's conclusion that the action will not significantly affect the human environment, issue a finding of no significant impact or "FONSI." *Id.* §§ 1508.9; 1508.13. Second, because the preparation of an EA is itself time consuming and burdensome, an agency can identify a class of actions, known as a categorical exclusion ("CE"), which normally does not significantly affect the human environment. *Id.* §§ 1507.3(b)(2)(ii); 1508.4. If the agency determines that an action falls into a previously adopted CE and that there are no extraordinary circumstances rendering a normally excluded action likely to have a significant effect, *Id.* § 1508.4, it can go forward with the action absent NEPA documentation, that is without the need to prepare an EA or EIS. *Id.* § 1501.4; *see also Wildlaw v. United States*

*Forest Serv.*, 471 F.Supp.2d 1221, 1226 (M.D.Ala.2007) (discussing NEPA and concept of categorical exclusions). The Federal Highway Administration's regulations define CEs as:

> [A]ctions which meet the definition contained in 40 CFR 1508.4, and, based on past experience with similar actions, do not involve significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

23 C.F.R. § 771.117(a). Federal Highway Administration's regulations specify twenty-one categories of actions which meet the CE criteria and normally do not require any further NEPA approvals within the agency. *See* 23 C.F.R. §§ 771.117(c); 771.115(b). The regulations also provide that other actions "may be designated as CEs are satisfied and that significant environmental effects will not result." *Id.* § 771.117(d); *see id.* § 771.115(b). The regulations contain a nonexclusive list of examples of the types of actions which may be designated as CEs after administration approval. *Id.* § 771.117(d).

376, 172 L.Ed.2d 249 (2008). As summarized below, plaintiff has not met the prerequisites for obtaining preliminary injunctive relief. An Appendix is attached for those interested in a lengthy exposition, those who wish to appeal and those who suffer from insomnia.

■ With respect to likelihood of success on the merits, plaintiff contends all projects affecting U.S. 281 or Loop 1604, which someday may look like Charlotte's web,[39] must be analyzed in a single NEPA document and that FHWA improperly segmented the interchange improvements from other projects in violation of NEPA. However, improper segmentation occurs only if the project at issue has no "independent utility." *Save Barton Creek Ass'n v. FHWA,* 950 F.2d 1129, 1140 (5th Cir. 1992). The agency made a reasonable finding that replacing the congested stop lights with direct connectors, along with other safety and mobility enhancements included in the project, will be extremely useful even if no other projects are undertaken in the U.S. 281 or Loop 1604 corridor. AR Doc. 340.

■ Plaintiff next contends with respect to a likelihood of success on the merits that the interchange improvements do not qualify as a CE under FHWA regulations. However, plaintiff's argument is based largely on the cost and duration, neither of which is a material factor. FHWA may categorically exclude a project from further NEPA review so long as the agency determines, based on its experience and expertise, the project: (1) satisfies the general CE requirements and (2) does not involve "significant environmental impacts." 23 C.F.R. § 771.117(a), (d); 23 C.F.R. § 771.115(b). A review of the Administrative Record reflects the FHWA rationally determined the project will have no significant impact and otherwise qualified as a CE based upon the extensive analyses and documents in the record. Although plaintiff interprets the regulations differently, the Fifth Circuit has made clear "[c]ourts should defer to the agency's interpretation of its own [CE] regulations." *West Houston Air Comm. v. FAA,* 784 F.2d 702, 705 (5th Cir.1986).

Plaintiff has also filed declarations from several individuals who criticize the FHWA's decision and various aspects of the supporting analyses. These declarations are not part of the Administrative Record and plaintiff has not shown they meet an exception which renders them legally relevant to the determination of whether FHWA's decision complied with NEPA. Though plaintiff attempts to create a "battle of the experts," with each party asserting their analysis is more reasonable than the other's, such attempt is not the proper procedural or substantive method for an appeal of this nature. Moreover, plaintiff does not dispute that defendants do indeed have karst invertebrate environmental experts on site with authority to immediately stop construction if a void, cave or suspected karst feature is discovered. Lanham Decl. ¶ 12. Only after confirmation by the geologist and permitted karst specialist that the karst feature does not qualify as a suitable habitat for endangered karst invertebrates will construction continue. *Id.* Under the highly deferential standard afforded to agencies pursuant to NEPA, however, it is not within the purview of the federal courts to intervene if the result was not arbitrary or capricious. *Spiller v. White,* 352 F.3d 235, 244 (5th

---

**39.** "Charlotte's Web" is a children's novel by American author E.B. White about a pig named Wilbur who is saved from slaughter by an intelligent spider named Charlotte. The book was first published in 1952, with illustrations by Garth Williams. E.B. WHITE, CHARLOTTE'S WEB (Harper Collins 1952).

Cir.2003). The agency has made its decision. The Court is "thus obligated to defer to [the agency's] expert judgment." *Id.*

This Court holds the categorical exemption decision of FHWA was not arbitrary or capricious.

Plaintiff has also failed to present sufficient evidence that it is likely to suffer irreparable injury as a result of any construction activities which may occur prior to a ruling on the merits. Plaintiff's declarants offer speculation about what they believe could occur. As a matter of law, however, simply alleging some possibility of irreparable injury does not support the issuance of a preliminary injunction, which is an extraordinary remedy never awarded as of right. *Winter*, 129 S.Ct. at 375–76.

■ Plaintiff's declarants, residents of a subdivision adjacent to the project, complain that traffic will be diverted through their neighborhoods creating congestion, noise and air pollution.

While the Court recognizes such projects create quite a kerfuffle (as opposed to a kartoffel) in surrounding areas, temporary construction disruption is a price of continued human migration and procreation. The endangered species list is not likely to see *Homo sapiens* added to it.

■ "To be considered to be irreparable, the injury must be permanent or of long duration." *West Ala. Quality of Life Coal. v. FHWA*, 302 F.Supp.2d 672, 683 (S.D.Tex.2004). The hypothetical effects on the neighborhood during the construction process, even if they were to occur, would be temporary and thus not irreparable. *See id.* (finding there was no showing of irreparable harm because, "while there may be temporary effects of the construction project such as inconvenience, increased traffic, and increased noise and air pollution ..., the project has a life expectancy of 33 months, which is not permanent or of long duration").

Plaintiff has not satisfied the remaining two requirements for injunctive relief. Plaintiff's interest in additional NEPA process is outweighed by the countervailing costs of delaying the project and prolonging the severe congestion at the interchange, which poses a threat to public safety, reduces the quality of life for the thousands of people who use the interchange every day, and creates thousands of hours of traffic delays each month. These same factors demonstrate an injunction would not serve the public interest, nor improve air or water quality.

## EPILOGUE

**What a piece of work is a man,
How noble in reason,
How infinite in faculties ... !** [40]
(Well, perhaps not.)

The leaders of the twelve tribes of Israel taught their people to "[d]esignate a place outside the camp where you can go to relieve yourself." [41] American GIs in the foxhole had a more odorous but less printable way of expressing the same idea. *See also* the common sense of Uncle Fred and Aunt Delia Grantham who built the outhouse away from their water well. *Order Concerning U.S. Highway 281 Toll Road Project*, Docket no. 106, at 2 ("They knew nothing about computers or air conditioning or environmental impact statements, but they were wise enough not to build the

---

**40.** WILLIAM SHAKESPEARE, HAMLET, PRINCE OF DENMARK 41 (W.G. Clark & W.A. Wright, eds., Oxford, Clarendon Press Series 2006) (1599–1601).

**41.** *Deuteronomy* 23:12

privy close to their water supply.") (Bi-ery, J.).

## The fault, dear Brutus, is not in our stars,
## But in ourselves,....[42]

*Homo sapiens,* who rely on the South Texas version of Ol' Man River,[43] apparently missed military basic training and those biblical lessons of protecting the Edwards,[44] the latest examples being 54,000 and 400,000 gallons of human sewage spilled over the aquifer as a result of human hubris and unbridled suburban growth.[45] Instead of the "X Files,"[46] this drama could be called the "Yuck Files." So much for computer technology saving people from themselves. Nor does there appear to be a little Dutch boy[47] or a hoped-for powerful wizard behind the curtain[48] who can save them either.

Whether one is glass half-empty Cassandra or glass half-full Pollyanna, the water in the glass best be clean.[49]

**42.** William Shakespeare, Julius Caesar 186 (Horst Zander, ed., Routledge 2005) (1599–1601).

**43.** "Ol' Man River" is a song in the 1927 musical Show Boat with music by Jerome Kern and a book and lyrics by Oscar Hammerstein II. Http://www.ibdb.com (last visited April 14, 2011).

**44.** The Edwards Aquifer provides the "springflow required for endangered species habitat, as well as recreational purposes and downstream uses in the Nueces, San Antonio, Guadalupe and San Marcos river basins." Http://www.edwardsaquifer.org (last visited April 14, 2011).

**45.** San Antonio Water System crews on December 28, 2010, were cleaning up a sewer overflow near a lift station in far north San Antonio, located near Evans Road and U.S. 281. It appears that the fail-safe alarm system did not sound when debris clogged the pumps at the lift station, triggering a power shutdown, resulting in wastewater overflow into nearby Mudd Creek. The amount of the overflow is estimated at 54,000 gallons. Mudd Creek is on the Edwards Aquifer Recharge Zone. Http://www.saws.org.com (Lift Station Malfunction Causes Sewer Overflow) (last visited March 22, 2011); *see also id.* at August 20, 2010: Major Sewer Overflow in Northwest San Antonio (informing public that San Antonio Water System crews were cleaning up a 400,000 gallon sewer spill on the Edwards Aquifer contributing zone) (last visited March 22, 2011).

**46.** "The X–Files" is an American science fiction television series which embraced conspiracy theories centered on efforts to uncover the existence of extraterrestrial life. The show was a hit for Fox network and the program originally aired from September 10, 1993 to May 19, 2002. *The X Files* (Fox television broadcast 1993–2002).

**47.** The novel, "Hans Brinker, or the Silver Skates." by American author Mary Mapes Dodge, takes place in the Netherlands during the early 19th Century. Although the novel is about a boy who entered an ice skating race, a small fictional story within the novel actually became well known in its own right. The story within the story, called "The Hero of Haarlem," is of a Dutch boy who saves his country by putting his finger in a leaking dike. Despite the cold, the boy stays all night until the adults in his village find him. Mary Mapes Dodge, Hans Brinker, or the Silver Skates 58–60 (Digireads.com Publishing 2009) (1865). The story of the Dutch boy has since been retold by several poets and children's authors.

**48.** "The Wizard of Oz" is a 1939 American musical fantasy film based on the 1900 novel "The Wonderful Wizard of Oz" by Frank Baum. In the story, Dorothy and her dog Toto are caught in a tornado's path and somehow end up in the Land of Oz. Dorothy meets some memorable friends and foes in her journey to meet the Wizard of Oz, who everyone says can help her return home and possibly grant her new friends their goals of a brain, heart and courage. The Wizard of Oz (Metro–Goldwyn–Mayer 1939).

**49.** In Greek mythology, Cassandra was a princess in Troy endowed with the gift of prophecy, but fated by Apollo never to be believed. Webster's II New Riverside Univ. Dictionary 235 (1984). A Cassandra-type person is characterized by unheeded negativity

A rabbi from Nazareth spoke of "lilies of the field," "the least of those among us," "reaping what one sows," and "they know not what they do," thoughts which take on new meaning in the context of stewardship, or ignominious lack thereof, of the natural world.[50] To live those words in enlightened self-interest would require the better angels of *Homo sapien* nature.[51]

Insouciant humans seem to misunderstand they consist of 61.8% $H_2O$[52] and misunderestimate their folly in the use of 60% of water for green lawns[53] in a semi-arid,

drought prone region. Nice to look at, but does nothing to quench thirst or satisfy hunger.

*Sapiens* is Latin for wise. If *Homo sapiens* suppress their instinct to survive and fail to care for the whole circle of life,[54] including karst invertebrates, the species should be renamed *Homo stupiditus,* having breached the environmental contract[55] between themselves and all the Little Critters.

Ten years of extreme floods, droughts, blizzards, fires and hurricanes[56] give new

and pessimism. *Id.* Pollyanna is the heroine of the novel of the same name written by Eleanor Porter in 1913. *Id.* at 935. A Pollyanna-type person is characterized by blind faith and foolish optimism. *Id.*

**50.** Matthew 6:28 ("Look at the lilies of the field and how they grow."); Matthew 25:40 ("Whatever you did for one of the least of these brothers and sisters of mine, you did for me."); Galatians 6:7 ("For whatsoever a man soweth, that shall he also reap."); Luke 23:34 ("Jesus said, 'Father, forgive them, for they know not what they do.'")

**51.** From the First Inaugural Address of President Abraham Lincoln. March 4, 1861.

**52.** ARTHUR C. GUYTON, TEXTBOOK OF MEDICAL PHYSIOLOGY 274 (W.D. Saunders 1991).

**53.** Texas A & M Agricultural Extension Service, Response to "Ask the Expert" question, April 8, 2011 (on file at Chambers).

**54.** "The Circle of Life" is a song from Disney's 1994 animated film "The Lion King," composed by Elton John with lyrics by Tim Rice. ELTON JOHN, *The Circle of Life,* from THE LION KING (Walt Disney Productions 1994).

**55.** Jean Jacques Rousseau wrote that "each of us puts his person and all his power in common under the supreme direction of the general will, and in a body we receive each member as an indivisible part of the whole." Jean JACQUES ROUSSEAU, OF THE SOCIAL CONTRACT, OR PRINCIPLES OF POLITICAL RIGHT (DUCONTRAT SOCIALOU PRINCIPLES DU DROIT POLITIQUE) (Am-

sterdam Press 1762). The author believed that society and the government create a social contract by a process of mutual consent, agreeing to abide by certain rules and to accept duties to protect one another from violence, fraud, or negligence. *Id.*

**56.** The U.S. Climate Extremes Index published by the National Oceanic and Atmospheric Administration at the National Climate Date Center documents increasing extreme weather-related events including floods, droughts, blizzards, fires, hurricanes, mud slides, earthquakes, and tsunamis. during the last ten years. Http://www.ncdc.noaa.gov/extremes/cei/index/html (last visited March 30, 2011). In a single day of wild weather on April 10, 2011, a tornado flattened the town of Mapleton, Iowa; a lightning strike sent nine to the hospital in Raleigh, North Carolina; and flood waters devastated Fargo, North Carolina, as the Red River crested for the third time in so many years. *See* Http://www.cpc.ncep.noaa.gov. (last visited April 11, 2011). On April 9, 2011, the Texas Forest Service announced that wildfire weather conditions "could shape up to be among the worst in Texas history." Http://www.txforestservice.tamu.edu/mail/default.aspx (last visited April 11, 2011). The next day, west Texas was ravaged by nine separate unconstrained wildfires fueled by pervasive drought conditions and winds gusting up to 50 m.p.h. *Id.* As of April 11, 2011, with raging fires in Fort Davis and the surrounding area expected to last several weeks, the Texas Forest Service announced it is establishing a regional office in Midland to battle outbreaks which are predicted to occur until extreme drought conditions are broken. *Id.* A furious storm system

meaning to "I've seen fire and I've seen rain."[57] In Texas, this past March—the month which usually brings spring rains—was listed as the driest month of March in recorded history.[58] Wildfires have spread across more than 700,000 acres and a fire in southwest Austin destroyed at least eight homes and damaged ten others on April 17, 2011.[59]

A prescient, and follicly impaired, judge wrote nine years ago that Mother Nature bats last and the top of the eighth is at hand.[60] It is beginning to look like the bottom of the eighth inning.

> At the end of the game,
> We are all the same,
> Back to the Earth,
> From whence we came.[61]

Perhaps *Homo sapiens* will experience a Darwinian epiphany to take better care of their home before they return to it. The alternative is a Captain Kirk moment: "Beam me up, Scotty!"[62]

The motion for preliminary injunction is DENIED.

Happy trails, and ramps, to you,[63] 281.

Signed on Earth Day, April 22, 2011.

With grateful appreciation to Court family members Joani Sullivan. Gloria Christmas. Nathan Mechler, Chris Poage, Martin Strasser, Liane Noble, Neha Casturi, Edgar Napoles and these authors and sources:

## APPENDIX

### *FACTUAL BACKGROUND*

The U.S. 281/Loop 1604 existing interchange at issue consists of three levels: U.S. 281 main lanes at the bottom level; frontage road intersections at the second level; and Loop 1604 main lanes at the third level. Both U.S. 281 and Loop 1604 are high volume roadways. All vehicles traveling from U.S. 281 North to Loop 1604 and vice versa must exit to the frontage roads and proceed through signalized intersections.

which began on April 14, 2011, brought over 62 tornados, along with flash floods and hail, claiming at least 43 lives in Arkansas, southeast Oklahoma and North Carolina, while drought and fires continued in Texas and Oklahoma. Http://www.ncdc.noaa.gov/stories2011/20110317.html (last visited April 19, 2011). Meanwhile, widespread and record setting floods occurred from the North Central United States through the Midwest and the Northeast. *Id.*

57. JAMES TAYLOR, FIRE AND RAIN (Apple Records 1976).

58. Http://txforestservice.tamu.edu (last visited April 18, 2011).

59. Http://npr.org/templates/story (quoting Austin Fire Department spokesman Chayer Smith) (last visited April 18, 2011).

60. *Center for Biological Diversity v. United States Fish & Wildlife Serv.*, 202 F.Supp.2d 594, 663 (W.D.Tex.2002) (Biery, J.).

61. Obituary for my daughters' favorite federal judge when the inevitable probably will happen.

62. "Beam me up, Scotty!" is a catch phrase which made its way into pop culture from the science fiction television series Star Trek. It comes from the command Captain Kirk (played by William Shatner) gives his chief engineer (played by James Doohan). Montgomery "Scotty" Scott, when he needs to be transported back to the Starship Enterprise. JAMES DOOHAN, BEAM ME UP, SCOTTY: STAR TREK'S SCOTTY-IN HIS OWN WORDS (Pocket Books 1996).

63. "Happy Trails" by Dale Evans Rogers was the theme song for the 1940s and 1950s radio program and the 1950s television show starring Roy Rogers and Dale Evans Rogers. The song. which begins "Happy trails to you" was always sung over the end credits of the program. DALE EVANS ROGERS, HAPPY TRAILS (RCA Victor Records 1952): http://www.royrogers.com/ (last visited March 30, 2011).

Traffic on these roadways has increased substantially over the last ten years, causing delays at the frontage road signals. Congestion is substantially worse during peak periods. Administrative Record ("AR") Doc 338 at 3. Currently, approximately 245,000 vehicles per day travel though the U.S. 281/Loop 1604 interchange, and this number is expected to exceed 490,000 by 2035, a projected increase of 100%. *Id.* Collisions are also a problem. *Id.* at 4. According to the San Antonio Police Department, 132 collisions were reported at the U.S. 281/Loop 1604 interchange in 2008, more than any other interchange in San Antonio. *Id.*

The U.S. 281/Loop 1604 interchange improvements at issue include constructing four direct connectors, including auxiliary lanes and ramp modifications. The proposed project would also include additional safety and mobility enhancement not necessitated by the direct connectors. The proposed safety and mobility enhancements would include lighting improvements, sidewalks and pedestrian bridges. The limits of the interchange improvements extend from approximately Bitters Road to Redland Road on Loop 1604, and Bitters Road to Loop 1604 on U.S. 281 North. No additional right-of-way is required to build the project. AR Doc. 338 at 4.

One measure of a roadway's traffic handling capability is its Level of Service ("LOS") rating. LOS ratings average from "A" (free flowing traffic) to "F" (traffic demand exceeds capacity). *Id.* Under current conditions, the U.S. 281/Loop 1604 interchange operates as a LOS of "F" during morning and afternoon peak hours. *Id.*

*PROCEDURAL BACKGROUND*

Plaintiff moves for a preliminary injunction barring clearing, construction and re- lated activities for the proposed highway U.S. 281 and Loop 1604 interchange improvements against the Federal Highway Administration ("FHWA"), the executive directors of the Texas Department of Transportation ("TxDOT"), and the Alamo Regional Mobility Association ("ARMA") in their official capacities. The preliminary injunction request focuses on plaintiff's National Environmental Policy Act ("NEPA") claims. Plaintiff is not seeking to enjoin the United States Fish and Wildlife Service and states it intends to brief its Endangered Species Act claims in a separate motion for summary judgment.

Plaintiff's NEPA allegations are:

(1) The proposed project, approved as a documented categorical exclusion ("CE") from NEPA and misleadingly labeled "operational" improvements to the U.S. 281/1604 interchange, is wholly inconsistent with the CE regulations given the project's size, context, likely environmental impacts and substantial controversy;

(2) The CE project has been illegally segmented from the other U.S. 281 and Loop 1604 improvements to avoid the environmental impact statement(s) ("EIS") being prepared for U.S. 281 and Loop 1604, and building the CE project will impermissibly prejudice the EISs; and

(3) Independent of segmentation, it is impossible to conclude that the CE project, added to the other 44.5 miles of improvements proposed for the U.S. 281/Loop 1604 interchange, mainly over the Edwards Aquifer recharge zone, does not add up to a significant cumulative impact.

With respect to plaintiff's allegations regarding "prejudice to the EISs," currently an EIS is being prepared on a 7.5 mile

stretch of U.S. 281 (Loop 1604 to Borgfeld Road) and a separate EIS is being prepared for a 37 mile stretch of Loop 1604 (U.S. 90 West to IH 35 North).

As set forth in its motion and four attached affidavits (Declaration of D. Lauren Ross, Ph.D., P.E., environmental engineer and water resources expert; Declaration of Bob Sartor, private citizen; Declaration of Reid Ewing, Ph.D., expert on transportation; Declaration of Richard Alles, AGUA member, AGUA board member and former AGUA technical research director), plaintiff contends allowing construction activities to proceed during the course of this case would result in irreparable harm to plaintiff, the environment, the public interest, and the ability of this Court to fashion an effective remedy upon final hearing of this case. Defendants argue plaintiff has not met its burden of showing it is entitled to a preliminary injunction.

### STATUTORY AND REGULATORY BACKGROUND

■ In determining whether the CE action taken by the FHWA under NEPA should be enjoined, the standard established by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, applies. *See North Carolina Alliance for Transp. Reform, Inc. v. United States Dep't of Transp.*, 151 F.Supp.2d 661, 678 (M.D.N.C. 2001) ("National Environmental Policy Act contains no independent private right of action but the ... APA expressly provides a right to judicial review of all final agency actions, including NEPA decisions"); *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency actions or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial relief thereof"). The application of this standard of review has been explained as follows:

Under this very narrow standard of review, we may not weigh the evidence in the record pro and con. Instead, our role is to review the agency action to determine whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment. Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious. Indeed, the agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record.

*Harris v. United States,* 19 F.3d 1090, 1096 (5th Cir.1994) (internal quotations and citations omitted.); *see also Lodge Tower Condo. Ass'n v. Lodge Props., Inc.,* 85 F.3d 476, 477 (10th Cir.1996) ("Review under § 706 is narrow and the agency need only demonstrate that it considered relevant factors and alternatives after a full ventilation of issues and that the choice it made was reasonable based on that consideration.") (quoting *Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1453 (10th Cir. 1994)). "Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis and the fact that on the same evidence the reviewing court could have reached a contrary decision will not support a determination that the action was arbitrary and capricious." *Carlisle Paper Box Co. v. NLRB,* 398 F.2d 1, 7 (3d Cir. 1968); *see also Kaplan v. Johnson,* 409 F.Supp. 190, 196 (N.D.Ill.1976), *rev'd on other grounds,* 545 F.2d 1073 (7th Cir. 1977); *Green v. United States Coast Guard,* 642 F.Supp. 638, 642 (N.D.Ill.1986) (citing to *Kaplan* and recognizing that " 'reviewing court is not barred from setting aside an agency decision when it can-

not conscientiously find that the evidence supporting that decision is substantial,' it may not 'displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*' ").

■ In addition, when an agency is acting within its "own sphere of expertise," this Court's review "must be very deferential." *Center for Marine Conservation v. Brown*, 917 F.Supp. 1128, 1143 (S.D.Tex. 1996); *see also Loggerhead Turtle v. County Council*, 120 F.Supp.2d 1005, 1013 (M.D.Fla.2000) (noting that court must be "most deferential" because agency's "special scientific expertise" was involved). "An agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, the court might find contrary views more persuasive." *Center for Marine Conservation*, 917 F.Supp. at 1143 (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)); *see also Bennett v. Spear*, 5 F.Supp.2d 882, 885 (D.Ore.1998) (finding that, when specialists express contrary views, agency given discretion to rely on "the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive") (quoting *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851). The choices by the Federal Highway Administration are entitled to a "presumption of regularity." *Loggerhead*, 120 F.Supp.2d at 1013. An agency violates the APA, and in this case NEPA, if it:

relies on factors Congress did not intend for it to consider, fails to examine an important aspect of the problem, offers an explanation for its decision that contradicts the evidence before the agency, or is so implausible that it cannot be attributed to a product of agency expertise.

*North Carolina Alliance for Transp. Reform, Inc. v. United States Dep't of Transp.*, 151 F.Supp.2d 661, 679 (M.D.N.C. 2001). As set forth in *Sierra Club v. Babbitt*, 15 F.Supp.2d 1274, 1279 (S.D.Ala. 1998), this Court, in applying the arbitrary and capricious standard of review, may not:

set aside an agency action that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute, ". . . the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found the choice made.' "

(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Under NEPA and its implementing regulations issued by the Council on Environmental Quality ("CEQ"), there are "three typical classes" of actions which require different levels of analysis. 40 C.F.R. § 1507.3(b)(2). 23 C.F.R. § 771.115 describes the three categories of actions which prescribe the level of documentation required by the FHWA in the NEPA process. First, when the agency proposes a "major [f]ederal action[ ] significantly affecting the quality of the human environment," NEPA requires the preparation of a comprehensive environmental impact statement ("EIS"). *Id.; see also* 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.1; 40 C.F.R. § 1508.11. The responsible federal agency first prepares a draft EIS and solicits public comments. 40 C.F.R. § 1503.1. The agency must then "assess and consider" the comments in drafting the final EIS. 40 C.F.R. § 1503.4; *see also* 40 C.F.R. § 1506.10(b). When the agency makes its final decision

regarding the proposed action and alternatives discussed in the final EIS, the agency prepares a "concise public record of decision." 40 C.F.R. § 1505.2.

Where the significance of a proposed action is not clearly established, an agency may prepare an environmental assessment ("EA") to determine whether an EIS is required. 23 C.F.R. § 771.115(c). The EA is a brief document containing sufficient information for the agency to determine whether to prepare an EIS or a finding of no significant impact ("FONSI"), which concludes the NEPA process. *Id.; see also* 40 C.F.R. § 1508.9(a)(1).

Finally, CEQ's regulations instruct agencies to identify a class of actions, named "categorical exclusions" or CEs, which normally "do not individually or cumulatively have a significant effect on the human environment" and are excluded from further NEPA review. 23 C.F.R. § 771.115(b); *see also* 40 C.F.R. § 1507.3(b)(2), 40 C.F.R. § 1508.4. CEs are "an integral part of the NEPA." *Clement v. LaHood*, No. 09–1056, 2010 WL 1779701, at *6 (E.D.Va. April 30, 2010). Establishing and using CEs can reduce excessive paperwork by eliminating unnecessary preparation of environmental impact statements. 40 C.F.R. § 1500.4(p).

CEQ has encouraged agencies to identify CEs using "broadly defined criteria which characterize types of actions that, based on the agency's experience," normally "do not cause significant environmental effects." Guidance Regarding NEPA Regulations, 48 Fed.Reg. at 34,265 (July 28, 1983) (codified at 40 C.F.R. 1500, et seq.). Consistent with CEQs guidance, FHWA's regulations define CEs as:

> [A]ctions which meet the definition contained in 40 C.F.R. 1508.4, and, based on past experience with similar actions, do not involve significant environmental im-

pacts. They are actions which: do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

23 C.F.R. § 771.117(a).

FHWA's regulations specify 21 categories of actions which meet the CE criteria and normally do not require any further NEPA approvals within the agency. 23 C.F.R. § 771.117(c); *see also* 23 C.F.R. § 771.115(b). The regulations also provide that other actions:

> may be designated as CEs only after Administration approval. The applicant shall submit documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result.

23 C.F.R. § 771.117(d); *see also* 23 C.F.R. § 771.115(b). The regulations contain a nonexclusive list of examples of the types of actions which may be designated as CEs after "Administration approval." 23 C.F.R. § 771.117(d). It is undisputed the proposed interchange project is not on the list.

In February of 2004, the FHWA and TxDOT entered into a Programmatic Agreement for implementing and applying the CE so long as the project has no significant environmental impact and otherwise meets the regulatory criteria discussed above. AR Doc. 26 at 11. The FHWA determined that the CE is appropriate because the proposed improvement

to the U.S. 281/Loop 1604 interchange does not:

* Induce significant impacts to planned growth on area land use;

* Require the relocation of significant numbers of people;

* Have a significant impact on any natural, cultural, recreational, historic or other resource;

* Involve significant air, noise or water quality impacts;

* Involve significant impacts on travel patterns and

* Otherwise, either individually or cumulatively, have any significant environmental impacts.

Plaintiff disagrees and files its motion for preliminary injunction seeking to stop construction on the project.

## STANDARDS OF REVIEW

*Preliminary Injunctive Relief Under the APA*

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985).

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Winter*, 129 S.Ct. at 374 (citations omitted). The plaintiff must satisfy all four requirements. *Id.* at 375–76; *Nichols v. Alcatel USA*, 532 F.3d 364, 372 (5th Cir. 2008).

■ As noted above, plaintiff's likelihood of success on the merits is evaluated under the deferential standards contained in the APA, 5 U.S.C. § 706. *See Gulf Restoration Network v. United States Dep't of Transp.*, 452 F.3d 362, 367–68 (5th Cir.2006) (discussing NEPA claims review process under APA). The United States Court of Appeals for the Fifth Circuit recently reiterated that "[t]he APA prescribes a narrow and highly deferential standard." *Medina County Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir.2010). "This court may not overturn the agencies' decisions unless they were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)). "A court's role is not to weigh the evidence pro and con but to determine whether the agency decision 'was based on a consideration of the relevant factors and whether there was a clear error of judgment.' " *Delta Found., Inc. v. United States*, 303 F.3d 551, 562 (5th Cir.2002) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ In reviewing an agency's decision under the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous. *Texas Clinical Labs. Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir.2010). Plaintiff's assertion that FHWA bears the "initial burden" of demonstrating the validity of its decision is incorrect. The burden falls squarely on the plaintiff to overcome the presumption of the validity and demonstrate a substantial likelihood that the

FHWA's decision will not survive deferential APA review. Thus, plaintiff bears "a heavy burden of proof." *Mercy Hosp. v. Heckler,* 777 F.2d 1028, 1032 (5th Cir. 1985).

In sum, "[u]nder the APA, the administrative record is reviewed to determine whether the challenged action was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law...." *Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 326 (5th Cir.1988) (citing 5 U.S.C. § 706(2)(A)-(D)). The role of the Court is to "review the agency action to determine whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). As noted above, "the agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Harris,* 19 F.3d at 1096 (quoting *Motor Vehicle Mfrs. Ass'n of the United States,* 463 U.S. at 43, 103 S.Ct. 2856).

Accordingly, under the standard of review set forth in the Administrative Procedure Act, review under the arbitrary and capricious standard is narrow, and the Court cannot substitute its judgment for that of the agency. 5 U.S.C. § 706(2)(A). A court will reverse a decision as arbitrary and capricious only if the agency relies on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation which runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of*

*the United States,* 463 U.S. at 43, 103 S.Ct. 2856; *Texas Oil & Gas Ass'n v. EPA,* 161 F.3d 923, 933 (5th Cir.1998); *see also Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Lands Council v. McNair (Lands Council II),* 537 F.3d 981, 987 (9th Cir.2008) (en banc). Although this standard of review is a narrow, highly deferential one, our inquiry still must be thorough and probing. *Louisiana Crawfish Prods. Ass'n v. Rowan,* 463 F.3d 352, 355–56 (5th Cir.1991). The Court must assure itself the agency examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

*The Administrative Record*

The scope of judicial review under the APA is limited to the administrative record compiled by the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Extra record materials may not be considered absent "unusual circumstances." *Medina County Envt'l Action Ass'n v. Surface Transp. Bd.,* 602 F.3d at 687, 706 (5th Cir.2010). As a general rule, a court may not "substitute [its] own judgment for that of the agency by considering expert testimony that was not made a part of the administrative record." *Friends of Richards–Gebaur Airport v. FAA,* 251 F.3d 1178, 1190 (8th Cir.2001) (upholding CE and refusing to consider extra-record "citizen letters and expert testimony").

In support of its motion, plaintiff filed declarations which are not part of the administrative record. ARMA moves to strike plaintiff's evidence in support of its motion for preliminary injunction (docket no. 142) because it goes beyond the scope

of the administrative record, and consists of opinion testimony by purported expert witnesses and inadmissible opinion testimony by lay witnesses. In the event the Court is inclined to consider plaintiffs' declarations, defendants have filed declarations in response refuting those submitted by plaintiff.

Plaintiff did not move to supplement the administrative record nor has it made any showing that any particular extra-record material falls within the unusual circumstances identified by the Fifth Circuit. Nonetheless, because the Court requested additional information not apparent from the record, and because defendant has filed rebuttal declarations, the Court will out of an abundance of caution consider plaintiff's extra-record submissions. To this extent, ARMA's motion to strike (contained within docket no. 142) is DENIED. However, the Court has not considered extra-record evidence submitted by plaintiff which is unreliable, conclusory, not credible or inadmissible. To this extent, ARMA's motion to strike (contained within docket no. 142) is GRANTED.

*Plaintiff's Request for Oral Argument*

Plaintiff's request that the Court set a hearing on its motion for preliminary injunction. An evidentiary hearing is not always required before a court grants or denies a preliminary injunction. If factual matters are not in dispute, no oral hearing is required and the parties need only be given "ample opportunity to present their views of the legal issues involved." *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir.), *cert. denied,* 519 U.S. 821, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996): *see also Miller Brewing Co. v. Ft. Worth Distrib. Co.,* 781 F.2d 494, 496 (5th Cir.1986); *Commerce Park v. Mardian Constr. Co.,* 729 F.2d 334, 341 (5th Cir.1984). On the other hand, "where factual disputes are present-ed, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted." *Kaepa, Inc.,* 76 F.3d at 628 (internal quotations omitted); *see also Commerce Park,* 729 F.2d at 341. The basic question is whether a hearing will add anything material to the Court's consideration of the case. *Parker v. Ryan,* 959 F.2d 579, 584 (5th Cir.1992); *Worlds of Wonder, Inc. v. Veritel Learning Sys., Inc.,* 658 F.Supp. 351, 354 n. 2 (N.D.Tex. 1986). Here, the Court does not believe that oral argument will add anything material to the Court's consideration of this case. Plaintiff's request for a hearing is therefore DENIED.

## DISCUSSION

### *Plaintiff has Failed to Demonstrate a Substantial Likelihood of Success on the Merits*

*Plaintiff has not Shown a Likelihood of Success on its "Segmentation" Claim*

Plaintiff argues "the CE project has been illegally segmented from the other 281 and 1604 improvements to avoid the Environmental Impact Statements ("EIS") being prepared for 281 and 1604, and building the CE project will impermissibly prejudice the EISs." Currently, an EIS is being prepared on a 7.5 mile stretch of U.S. 281 (Loop 1604 to Borgfeld Road), and a separate EIS is being prepared for a 37 mile stretch of Loop 1604 (U.S. 90 West to IH–35 North).

"Improper segmentation" is "an attempt by an agency to divide artificially a major Federal action into smaller components to escape the application of NEPA to some of its segments." *Save Barton Creek Ass'n v. FHWA,* 950 F.2d 1129, 1140 (5th Cir.1992) (internal quotations omitted). "To determine whether a

single project is improperly segmented into multiple parts, this Circuit applies a four-part test which asks whether 'the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects.' " *O'Reilly v. United States Army Corps of Eng'rs*, 477 F.3d 225, 236 (5th Cir.2007) (quoting *Save Barton Creek Ass'n*, 950 F.2d at 1140). The central factor, however, is whether the project has "independent utility." *Save Barton Creek Ass'n*, 950 F.2d at 1140. Segmentation is improper only if the project "has *no* independent justification, no life of its own, or is simply illogical when viewed in isolation." *Id.* at 1139 (emphasis in original).

Because the interchange improvements at issue here certainly have independent utility, plaintiff's segmentation claim does not have a substantial likelihood of success on the merits. Additionally, the "other projects" referenced in plaintiff's motion—plans for possible expansion of portions of U.S. 281 and Loop 1604—cannot be the subject of improper segmentation. "It is important to note that 'projects,' for the purposes of NEPA, are described as 'proposed action,' or proposals in which action is imminent." *O'Reilly*, 477 F.3d at 236 (quoting 40 C.F.R. § 1508.23). Here, FHWA has published notices of intent to draft EISs for the possible expansion of portions of U.S. 281 and Loop 1604. *See* Notices: Federal Highway Administration–Environmental Impact Statement: Bexar County, Texas, Fed.Reg. 32,684 (July 8, 2009); Notices: Federal Highway Administration–Environmental Impact Statement: Bexar County, Texas, 75 Fed. Reg. 18, 941 (April 13, 2010). However, the range of alternatives to be analyzed in

the EISs does not appear to have been finalized, and the agency has not published even a draft of any EIS. Thus, nothing is imminent. Consequently, plaintiff cannot predicate a segmentation claim on the preliminary plans for possible expansion of U.S. 281 or Loop 1604.

More importantly, the FHWA rationally determined the interchange improvements will have substantial independent utility, regardless of whether other projects are undertaken in the U.S. 281 and Loop 1604 corridors, because the improvements are designed to ameliorate the serious safety and congestion problems in the project area. AR Doc. 340; Doc. 338 at 1, 3–4; Doc. 120; Doc. 112. The agency also found the project has "logical termini" derived from the Operational Analysis, (AR Doc. 112), and that additional projects along Loop 1604 or U.S. 281 "are not needed in order for this proposed project to perform its intended purpose." AR Doc. 340 at 1; Doc. 120. The agency's conclusion is reasonable and plaintiff cites no authority to the contrary. Plaintiff's assertion that the interchange improvements will "invariably prejudice the alternatives" evaluated in the other EISs under development is unsupported. Because the interchange project does not "dictate" that any other specific project be undertaken, it will not "restrict consideration of alternatives." *See Save Barton Creek Ass'n*, 950 F.2d at 1142. Finally, plaintiff cites no evidence showing the project will irretrievably commit federal funds to any other project.

In sum, plaintiff's segmentation claim is factually unsupported by the record and foreclosed by controlling precedent. *See id.* (rejecting claim that construction of Austin Outer Loop was improperly segmented where segments at issue would "serve a highly useful urban traffic purpose even if no other segments of the

Outer Loop are ever constructed" and did not "dictate that any other segment must be built."); *O'Reilly,* 477 F.3d at 237 (finding no improper segmentation where first phase of three-phase development plan could "stand alone without requiring" implementation of other phases, even though all three phases had originally been planned as a single project); *see also Utahns for Better Transp. v. United States Dep't of Transp.,* 305 F.3d 1152, 1184 (10th Cir.2002) (finding no segmentation where "[e]ach component can serve its transportation purpose whether or not the other projects are built. The components, although interrelated as part of an overall transportation plan, should individually contribute to alleviation of the traffic problems."); *Coalition of Sensible Transp. v. Dole,* 826 F.2d 60, 69 (D.C.Cir.1987) (finding interstate widening project was not improperly segmented from interchange improvements because improvements served legitimate purposes "in the absence of the I–270 expansion, and thus are sufficiently independent. They are expected to result in less congestion at interchanges, facilitate local traffic, and provide access to mass transit."); *Clement v. LaHood,* No. 09–1056, 2010 WL 1779701, at *6 (E.D.Va. April 30, 2010) (finding no segmentation because "the Project has independent utility, ameliorating traffic on westbound I–66."). Accordingly, plaintiff has not shown a likelihood of success on the merits of its segmentation claim for preliminary injunction purposes.

*FHWA's Decision to Approve the Project as a Categorical Exclusion ("CE")*

In support of its request for a preliminary injunction, plaintiff also argues the decision to approve the U.S. 281/Loop 1604 interchange as a CE is arbitrary and capricious. Specifically, plaintiff contends:

it defies common sense to conclude that a $145 million highway project extending six miles along Loop 1604 and three miles along U.S. 281 over the recharge zone of San Antonio's sole-source, Edwards Aquifer water supply, passing though and over the head of existing businesses and neighborhoods, and requiring more than two years of construction will not have any significant direct, indirect or cumulative impacts on travel patterns or the human environment. One of the aspects of this case which is most troubling to plaintiff is the fact that defendants have disclosed so little information about their proposed project, and performed so few analyses, that the conclusion of no significant impacts effectively amounts to a "trust us" approach.

Initially, the Court notes that the cost and scope of the project are not material factors under FHWA regulations. Rather, "the primary question to be answered in connection with the highway project pertain[s] not to its size and scope, but to whether it would have significant environmental impacts." *Florida Keys Citizens Coal., Inc. v. United States Army Corps of Eng'rs,* 374 F.Supp.2d 1116, 1140 (S.D.Fla. 2005). A CE may be appropriate "even in environmentally sensitive areas, so long as the applicable criteria and documentation are satisfied." *See id.* at 1140 (upholding CE for roadway improvements resulting in loss of 83.9 acres of wetlands); *see also Krichbaum v. United States Forest Serv.,* 17 F.Supp.2d 549, 558 (W.D.Va.1998) (upholding CE for project in municipal watershed).

Although plaintiff asserts the words "direct connectors" and "interchange" do not appear in the list of examples of projects which typically qualify for a CE contained in the regulations, the list is nonexclusive. Other projects may be categorically ex-

cluded as long as FHWA determines, based on its experience and expertise, that the projects: (1) satisfy the general CE requirements and (2) do not involve "significant environmental impacts." 23 C.F.R. § 771.117(a); .23 C.F.R. § 771.115(b): *see also Public Interest Research Group v. FHWA,* 884 F.Supp. 876, 892 (D.N.J.) (upholding CE for two entirely new high occupancy vehicle ("HOV") lanes added to twenty-one miles of highway, even though HOV lanes did not fit squarely within any of the regulatory examples), *aff'd,* 65 F.3d 163 (3d Cir.1995); *Ware v. FHWA,* No. 04–2295, 2006 WL 696551, at *12, *21 (S.D.Tex. Mar. 15, 2006) (upholding CE for project which did not fit squarely within regulatory examples and included braided ramps (one over the other) reaching height of seventy feet, "rehabilitating the pavement, replacing the bridge structures, reconstruction of access ramps, improvements to direct connectors, adding auxiliary lanes, reversing and/or relocating ramps, providing U-turns, and related projects"), *aff'd* 255 Fed.Appx. 838 (5th Cir.2007).

The administrative record documents that ARMA, TxDot and the FHWA collaboratively developed an extensive analysis of the potential environmental impact of the project to determine whether it qualified as a CE. AR Doc. 338.

The agencies also prepared a detailed biological assessment of the potential effects of the project on endangered karst invertebrates—none of which has been documented to exist in the project limits. AR Doc. 218; AR Doc. 338 at 40–41, 50–93. Karst invertebrates are certain spiders and other arachnids, beetles, and millipedes which inhabit caves and karst features. *Center for Biological Diversity v. United States Fish & Wildlife Serv.,* 202 F.Supp.2d 594, 598 n. 4 (W.D.Tex.2002)

(Biery, J.). Nine species of karst invertebrates have been listed as endangered. *Id.* Although none has been found at the construction site, the area is consistent with supporting two out of the nine endangered karst invertebrates: the *Rhadine exilis* and *Rhadine infernalis.*

FHWA and TxDot also consulted with the United States Fish and Wildlife Service, the agency responsible for Environmental Species Act compliance, who concurred that the project is not likely to significantly affect any endangered karst invertebrates. AR Doc. 244. In assessing potential impacts on roadway capacity and traffic patterns, the agencies also considered an independent Operational Analysis. AR Doc. 112. Finally, the agencies conducted public meetings and considered the public's input on the projects. AR Doc. 151; AR Doc. 337; AR Doc. 338 at 93–95.

After considering all of the information and applying its experience and expertise, the FHWA determined based on a 10,000 page administrative record that the project qualified as a CE under its regulations and the Programmatic Agreement between FHWA and TxDot. AR. Doc. 340. The document is 94 pages long. *Id.* The agency found there would be only insignificant impacts to planned growth and land use; no relocations; and no significant impacts to natural resources or to air, noise or water quality, including the Edwards Aquifer. *Id.* FHWA also found that, although there would be some impacts to traffic patterns, they did not rise to the level of significance. *Id.* FHWA further found the project is not likely to adversely affect any endangered karst invertebrates. AR. Doc. 340 at 1. Finally, FHWA determined the type of work included in the project was consistent with the regulatory examples of projects which typically qualify for a CE. AR Doc. 340 at 2. Accordingly, FHWA approved the project as a CE. *Id.*

Plaintiff primarily takes issue with two aspects of the agency's analysis. First, plaintiff disputes the FHWA's finding that the interchange improvements will not expand the capacity of U.S. 281 and Loop 1604. A review of the administrative record and relevant case law demonstrates that FHWA rationally determined the project would not increase the overall capacity of U.S. 281 or Loop 1604 because no new through-lanes would be added. AR Doc. 340; Doc. 338 at 1; Doc. 112 at 12; *see Ware*, 2006 WL 696551, at *26 (upholding FHWA's approval of project as CE based in part on finding that "the project would not add general purpose main travel lanes and instead involved changes in ramps, mainlines, and connectors for safety and not capacity improvements").

Plaintiff submits an outside-the-record declaration from an expert who has a different opinion. Ewing Decl. In the declarant's view, FHWA's regulations mandate that the agency prepare a more in-depth assessment than a CE for any project which reduces congestion at a point along a roadway in an urban and congested area. His the view is that any project designed to ameliorate a congested point along a roadway increases the capacity of the roadway because, as congestion is reduced, the rate of vehicles passing the point increases. Ewing Decl. ¶¶ 19–29. The declarant further opines that any increase in highway capacity in an urban and congested area results "in significant impacts to travel patterns, planned growth and land use," *id.* at ¶ 7, rendering the project ineligible for a CE under FHWA regulations. This proposition is unsupported by regulatory language and contrary to relevant case law. *See e.g., City of Alexandria v. FHWA*, 756 F.2d 1014, 1016, 1012–22 (4th Cir.1985) (upholding CE for project "designed to reduce congestion and travel times" on congested roadway in major urban area); *Clement v. LaHood*, No. 09–1056, 2010 WL 1779701, at *1, *13 (E.D.Va. April 30, 2010) (upholding CE for spot improvement project "to relieve traffic congestion in the westbound lanes of Interstate 66"); *Ware v. FHWA*, No. 04–2295, 2006 WL 696551, at *1 (S.D.Tex. Mar. 15, 2006) (upholding CE for variety of roadway improvements designed to alleviate "severe traffic congestion" on interstate near Houston, Texas); *Van Raden v. City of Portland*, No. 01–233, 2001 WL 34047031, at *1, *8 (D.Or. May 31, 2001) (denying motion to enjoin project approved as CE which was designed to alleviate "frequent traffic congestion and accidents" at railroad crossing in Portland, Oregon); *Public Interest Research Group v. FHWA*, 884 F.Supp. 876, 882, 892 (D.N.J.1995) (upholding CE for construction of new HOV lanes which "would reduce congestion in the affected area of Route 287, reduce vehicle miles of travel, . . . and reduce travelers' trip time.").

There is contrary authority which is distinguishable. *West v. Secretary of Transp.*, 206 F.3d 920, 924, 928 (9th Cir. 2000), involved "an entirely new" interchange designed to accommodate substantial new development, not improvements to an existing interchange in an area which is already highly developed. The Court also declined to adopt a "per se rule that all highway interchanges require an EA," *id.* at 929 n. 10, which is the ruling plaintiff is proposing.

Moreover, the FHWA acknowledged the project will impact traffic patterns by removing traffic from the current signalized intersections to the new direct connector ramps. The agency determined, however, that this change did not rise to the level of significance. AR Doc. 340 at 1; AR Doc. 338 at 42, 63, 74. "[C]ourts should defer to the agency's interpretation of its own

[CE] regulations." *West Houston Air Comm. v. FAA,* 784 F.2d 702, 705 (5th Cir.1986). Judicial "deference to the [agency's] fact-finding and conclusions includes deference to [its] judgment as to whether any particular environmental impact of the proposed [project] rises to the level of significance." *Spiller v. White,* 352 F.3d 235, 244 n. 5 (5th Cir.2003).

Plaintiff also challenges the agency's evaluation of the effects of the project on water quality and the Edwards Aquifer. However, the administrative record reflects the agencies thoroughly considered the potential direct, indirect and cumulative impacts, and rationally determined they would not be significant. *See* AR Doc. 338 at 8–10, 36–38, 62–63, 69–70, 90–93. Among other factors, the agencies considered data showing that the project will add only a negligible amount of impervious cover to the Edwards Aquifer recharge zone and will not require significant changes to existing grades which would entail major earthwork. *Id.* at 36–38.

The project is also subject to special rules issued by the Texas Commission on Environmental Quality ("TCEQ") designed to protect the Edwards Aquifer and hydrologically connected surface water. *Id.* at 9, 30; T.A.C. § 213.1. Under these rules, construction cannot proceed without an approved Water Pollution Abatement Plan ("WPAP") which meets numerous detailed requirements, including providing for the removal of 80% of total suspended solids in storm water runoff from the increase in impervious cover and employing the best management practices to protect water quality both during and after construction. 30 T.A.C. §§ 213.4(a)(1), 213.5(b); AR Doc. 338 at 37. Based on these and other factors, the FHWA found that effects to water quality, if any, will be temporary and minor. AR Doc. 338 at 37–38.

Plaintiff submits an outside-the-record declaration from an expert who is critical of the agency's analysis. Ross Decl. Notably, the declarant does not opine that the interchange project will have a significant impact on water quality. Rather, she is critical of various aspects of the agencies' analysis, Ross Decl. ¶¶ 17–25, 28–31, 33, 35, the TCEQ's rules themselves, *id.* at ¶¶ 26–27, 32, 34, 36, and the FHWA's reliance on those rules, *id.* at ¶¶ 34, 36. The Fifth Circuit recently rejected a similar attempt to criticize an agency for relying on the TCEQ rules in its analysis of a project's potential environmental impact. *Medina County Envtl. Action Ass'n v. Surface Transp. Bd.,* 602 F.3d 687, 705 (5th Cir.2010) (rejecting claim that agency's analysis was inadequate where agency found "the mitigation measures required by the TCEQ as a condition of approval of the WPAP would adequately address any danger that these activities might pose to groundwater and karst features or to the listed karst invertebrates that rely on them.").

Plaintiff's declarations are also legally irrelevant to the question of whether FHWA's decision complied with NEPA. "The mere fact that experts may disagree on the Project is insufficient to warrant reversal of the FHWA's determination." *Public Interest Research Group v. FHWA,* 884 F.Supp. 876, 891 (D.N.J.1995). "If all that is necessary to require an EIS or EA is a conflicting expert's opinion, the agency's process would be meaningless." *Id.* (citing *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1335 (9th Cir.1992)).

Plaintiff is attempting to create a "battle of the experts with each party asserting its analysis is more reasonable than the other's." *Spiller,* 352 F.3d at 244.

Under the highly deferential standard afforded to agencies pursuant to NEPA, however, it is not the job of the federal

courts to intervene in this fight. The agencies have made their decision. It was not arbitrary and capricious.

*Id.* The Court is "thus obligated to defer to [the agency's] expert judgment." *Id.*

Plaintiff makes two additional assertions on the merits. Citing declarations from two private citizens who complain mostly about the construction phase of the project, plaintiff asserts the project is controversial and requires an EIS. FHWA regulations provide that in "unusual circumstances," a project which typically qualifies as a CE may require additional study to determine whether a CE is proper. 23 C.F.R. § 771.117(b). The "unusual circumstances" include "[s]ubstantial controversy on environmental grounds." *Id.* at § 771.117(b)(2). "However, the mere existence of opposition does not trigger the [agency's] duty to prepare an environmental review." *West Houston Air Committee v. FAA,* 784 F.2d 702, 705 (5th Cir.1986). Courts "long ago rejected the suggestion that 'controversial' must necessarily be equated with opposition." *North Carolina v. FAA,* 957 F.2d 1125, 1133–34 (4th Cir.1992). Otherwise, "opposition, and not the reasoned analysis set forth in the environmental assessment, would determine whether a[ ][CE] would have to be prepared." *Id.*[1] Thus, "the outcome would be governed by a 'heckler's veto.'" *North Carolina,* 957 F.2d at 1134 (quoting *River Road Alliance, Inc. v. Corps of Eng'rs of United States Army,* 764 F.2d 445, 451 (7th Cir.1985)); *see also Friends of Richards–Gebaur Airport v. FAA,* 251 F.3d 1178, 1187 (8th Cir.2001) (upholding CE based in part on "determination that 65 letters opposing the project [most of which did not voice environmental concerns] did not constitute a substantial con-

troversy on environmental grounds"). Here, the FHWA acknowledged there was environmental opposition to the project, but concluded it was not substantial and that most of the opposition related to other tolling proposals. AR Doc. 340 at 1; AR Doc. 338 at 93–95.

Plaintiff further contends the lack of an air quality analysis shows the decision to issue a CE was arbitrary and capricious. The CE contains the following air quality analysis:

The proposed direct connectors are intended to enhance traffic safety and improve traffic flow. The proposed action would not add capacity to the existing facility; thus, *current and future emissions should continue to follow existing trends—unaffected by this project. Therefore, a Traffic Air Quality Analysis is not required.* The improvements addressed in this CE would have beneficial impacts to the air quality within the proposed project area because the proposed project would help to reduce congestion; thereby, reducing emissions.

A.R. Doc. 338 (emphasis added). Given the consideration and assessment defendants' made, plaintiff has not shown defendants made an arbitrary and capricious decision to ignore the issue of air quality or that their decision not to use other available tools for analyzing air quality was arbitrary and capricious.

Plaintiff further asserts FHWA's decision was arbitrary because it is "impossible to conclude that the CE project, added to the other 44.5 miles of improvements proposed for U.S. 281 and Loop 1604, mainly over the Edwards Aquifer recharge zone, does not add up to a significant cumulative impact." Under NEPA, a cumulative impact "is the impact on the environment

---

1. Although the cited case is distinguishable because it refers to an EA and an EIS, the Court sees no reason why it does not apply to a CE.

which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. The "reasonably foreseeable" standard "requires a substantial degree of certainty before a cumulative impacts analysis will be required." *Medina County Envtl. Action Ass'n*, 602 F.3d at 702.

As noted below, the plans for possible expansion of portions of U.S. 281 and Loop 1604 have not yet cumulated in concrete proposals. It is therefore impossible to determine what any future expansion projects, if any, may look like. Plaintiff's assertion there will be a significant cumulative impact is therefore speculative. In light of the uncertainty about the specific nature of any hypothetical future projects, the agencies are not required to perform any further analysis of the potential cumulative impact beyond what they have already done. *Id.* (determining that agency analysis of first phase of development plan did not require to consider cumulative impact of later phases, even though developer held long-term leases for land at issue, because "the fact of the long-term leases is not tantamount to a reasonable certainty that financial incentives will exist in the future to develop the land—certainly not in any way sufficiently specific for the respondents to conduct a meaningful scientific assessment of the development's effects").

Giving FHWA's decision deference, the Court finds the decision to approve the project as a categorical exclusion is rational. Accordingly, plaintiff has not shown a likelihood of success on the merits of this claim.

### Plaintiff has not Shown a Likelihood of Irreparable Harm

The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Thus, "the harm considered by the district court is necessarily confined to that which might occur in the interval between the ruling on the preliminary injunction and trial on the merits." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir.1983). Because this is an action under the APA, trial proceedings are unavailable. The legal issue of whether the agency's decision is arbitrary or capricious is generally resolved on summary judgment on the basis of the record. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir.1985). Plaintiff has not sufficiently demonstrated a likelihood that it will suffer irreparable injury from any construction activities which may occur before the Court enters a ruling on summary judgment.

Plaintiff asserts that "[a]ll four of the affidavits submitted with [its] motion establish irreparable harm." However, the Ewing declaration contains no testimony at all about any purported environmental harm from construction or the completed project. The Ross declaration contains no reasoned opinion or even a conclusory statement alleging irreparable harm. Although Dr. Ross warns of "potentially significant consequences," Ross Decl. ¶ 20, this vague conclusion is inadequate to support injunctive relief as a matter of law. "Issuing a preliminary injunction based only on a possibility or irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 375–76, 172 L.Ed.2d 249 (2008). Moreover, "[t]o be considered to be irreparable [for preliminary injunction purposes],

the injury must be permanent or of long duration." *West Ala. Quality of Life Coal. v. FHWA,* 302 F.Supp.2d 672, 683 (S.D.Tex.2004). The hypothetical effects Mr. Sartor describes to his neighborhood during the construction process, even if they were to occur, would be temporary and thus not irreparable. *See id.* (Finding there was no showing of irreparable harm because, "while there may be temporary effects of the construction project such as inconvenience, increased traffic, and increased noise and air pollution . . . , the project has a life expectancy of 33 months, which is not permanent or of long duration").

Mr. Alles offers opinion testimony on the alleged state of the Edwards Aquifer, its purported vulnerabilities and hydrological functions, the alleged effects of highway traffic, "human health impacts," and the purported medical effects of "increased air toxics." Alles Decl. ¶¶ 9–27. "[T]he *Winter* standard requires the plaintiff to demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence and a clear likelihood of success." *Jones v. Bank of Am., N.A.,* No. CV–09–2129–PHX–JAT, 2010 WL 3025521, at *1 (D.Ariz. July 30, 2010) (citing *Winter,* 555 U.S. 7, 129 S.Ct. 365, 374 (2008)). Mr. Alles' affidavit contains inadmissible hearsay. Moreover, for the most part, Mr. Alles complains about existing conditions. Alles Decl. ¶¶ 18–20, 22–24. He offers no competent evidence that construction is likely to irreparably harm him, the environment, or his group.

The agencies concluded on the basis of a thorough analysis that neither the construction nor the completed project will have a significant environmental impact. AR Doc. 338. The United States Fish and Wildlife Service, the agency responsible for implementing the Endangered Species Act, concurred that the project is not likely to adversely affect any endangered karst invertebrates, AR Doc. 244, a conclusion which plaintiff does not contest in its motion. The TCEQ's rules designed to protect the Edwards Aquifer apply to this project, and the TCEQ has approved the contractor's comprehensive WPAP. Indeed, the contract's water protection provisions go beyond the TCEQ's rules. Zertuche Decl. (filed by ARMA) ¶¶ 6–13. The contractor has many other environmental protection and monitoring protocols in place, including detailed procedures to insure the protection of any voids or potential karst features discovered during construction. *See* Lanham Decl. (filed by ARMA), ¶¶ 7–14. The project is also subject to noise abatement, air quality, and traffic control requirements designed to minimize any impacts of construction. *Id.* at ¶¶ 15–16; Claxton Decl. (filed by FHWA) ¶¶ 18–20, 24–26; Leary Decl. (filed by FHWA) ¶¶ 12, 14–15. Given the substantial information in the record and the many protective measures in place to insure that adverse effects are avoided or minimized, plaintiff's suggestions about possible harm are inadequate to support the issuance of an injunction.

As noted, plaintiff's opposition to the interchange project is in part based on its assertion that the project will adversely impact endangered karst invertebrates. None of plaintiff's declarators contends any endangered karst invertebrates actually inhabits the karst features in the area of the U.S. 281/Loop 1604 interchange project. Sprouse Decl. (filed by ARMA) ¶¶ 8–9 (explaining assessments of karst features were thorough and beyond what was required by law and yet did not detect any endangered species of karst invertebrates).

Setting aside the failure to identify any endangered karst invertebrates in the

karst features at issue, nothing in NEPA or the APA entitled plaintiff to evade the requirement of showing that the activities sought to be enjoined pose a substantial threat of irreparable harm. Plaintiff argues the karst features and other aspects of the environment will be significantly impacted by the completed project, but plaintiff is not seeking to enjoin the completed project. Rather, plaintiff seeks to enjoin "further construction, pre-construction, land clearing, or final phase design work" on the project, as well as "making any further financial commitment in pursuit of these activities." Plaintiff does not detail how these construction activities would cause irreparable harm.

In any event, procedures have been instituted to prevent irreparable injury to the karst habitat in the interchange area during construction. For example, if a void, cave, or suspected karst feature is discovered, all construction in the immediate area will be stopped, and the environmental compliance manager or environmental compliance inspector will be notified immediately. Lanham Decl. (filed by ARMA) ¶ 12. The void, cave or suspected karst feature will be investigated by a geologist and karst specialist holding the required United States Fish and Wildlife Service permit to determine whether conditions are favorable for endangered karst invertebrate species and the results of the biological survey will be presented to ARMA for coordination with TxDot and FHWA to ensure compliance with the Endangered Species Act before work in the area proceeds. *Id.* Only if it is determined by the geologist and permitted karst specialist that the karst feature does not meet the requirements for a suitable habitat for endangered karst invertebrates will construction continue. *Id.*

This procedure has already been implemented successfully during the geophysical testing for the U.S. 281/Loop 1604 interchange project. Lanham Decl. ¶ 12–13. With this procedure in place, there is no substantial threat of imminent, likely, and irreparable harm to the karst habitat. And, the conclusion that these mitigating measures are protective of the karst features, AR Doc. 338 at 92–93, is the type of technical determination to which the Fifth Circuit requires courts to afford substantial deference. *Medina County Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 705 (5th Cir.2010) (requiring substantial deference to agency conclusion that mitigating measures were protective of endangered karst invertebrates at issue).

Other procedures have also been put in place to prevent irreparable harm during construction. The WPAP contains procedures for limiting and filtering drainage to protect the Edwards Aquifer from pollutants. Sprouse Decl. (filed by TxDot) ¶ 10. "White sound" back up alarms will be used during construction which involve significantly less environmental noise exposure than traditional narrowband back up alarms. Lanham Decl. ¶ 15 & Ex. D. Noise walls will be constructed in specified locations and additional noise walls must be constructed if a noise study and consultation with affected homeowners demonstrates that the noise walls are needed and desired. *Id.* Mitigation measures such as placement of rock at construction entrances and application of fresh water will control dust in the construction area. *Id.* at ¶ 16; *see also* AR Doc. 338 at 49 (discussing temporary and limited impact of construction noise); AR Doc. 338 at 92–93 (discussing required procedures to be implemented to protect water quality during construction).

Procedures have also been put in place to include beneficial steps toward improving the environment. For example, the WRAP for the interchange project includes proposed "best management practices" or "BMPs" for addressing karst features in the area. These BMPs include the installation of channelization berms and sealing measures. Zertuche Decl. ¶ 6; Sprouse Decl. ¶¶ 10, 12. These BMPs are intended to and likely will reduce the amount of pollution currently entering the karst features and the Edwards Aquifer in the U.S. 281/Loop 1604 interchange area. Rather than causing immediate, irreparable injury, these features are intended to improve the karst habitat in the projected area.

*Plaintiff has not Shown the Balance of Equities Disfavors Defendants and Injunctive Relief Would Serve the Public Interest*

■ A plaintiff seeking an injunction must establish "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 129 S.Ct. at 374. The balance of equities in this case favors defendants and injunctive relief would not serve the public interest.

■ Presuming plaintiff could demonstrate a likelihood of success on its NEPA cause of action, there is "no general presumption that a NEPA violation will in all cases outweigh other public interests for purposes of determining appropriateness of preliminary injunctive relief." *Chemical Weapons Working Group, Inc. v. United States Dept. of the Army*, 963 F.Supp. 1083, 1097 (D.Utah 1997); *see also Winter*, 129 S.Ct. at 376 (presuming NEPA violation and irreparable injury but holding that "any such injury is outweighed by the public interest" and harm to agency, and "[a] proper consideration of these factors alone requires denial of the requested in-

junctive relief"). While plaintiff may have an interest in additional NEPA review, it has not shown that this interest is outweighed by the significant human and financial costs which would result from an injunction.

For example, 132 collisions were reported at the U.S. 281/Loop 1604 interchange in 2008—an average of 11 per month. AR Doc. 338 at 4. The interchange improvements will enhance safety and address the most severe congestion problems at the interchange, eliminating an estimated 511,000 hours of traffic delays annually at a cost savings of $7 million. AR Doc. 112 at 10. Even a month of delay increases the risk of accidents which might otherwise be avoided if the project is completed on time and would require motorists to suffer through an estimated 42,583 hours of traffic delays at a cost of $583,000. *Id.* at 10–12.

The benefits of this project include reducing the severe congestion at the interchange, enhancing safety and improving the quality of life for the thousands of people who use the U.S. 281 and Loop 1604 corridors every day. AR. Doc. 338 at 1–5; Doc. 112; Claxton Decl. ¶¶ 7, 9; Rodriguez Decl. ¶¶ 8–11; 14–20; Irwin Decl. ¶¶ 7–9. Plaintiff has not shown the preparation of further studies and reports would produce a benefit which could outweigh the gain of completing the project as soon as reasonably possible. Finally, "in exercising its sound discretion, the Court should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *see also Salazar v. Buono*, —— U.S. ——, 130 S.Ct. 1803, 1816, 176 L.Ed.2d 634 (2010) ("A court should be particularly cautious when contemplating [injunctive] relief that implicates public interests."). In light of the

public safety concerns and other factors discussed, enjoining construction would not serve the public interest. For these reasons, and those discussed in the Order Concerning the Internal Combustion Engine, H2O, *Homo Sapiens* and *Rhadine Exilis*. (And the Survival of the Latter Two), plaintiffs motion for preliminary injunction is denied.

It is so ORDERED.